UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


RAYMOND WADE                          CIVIL ACTION NO. 05-0876

VERSUS                                JUDGE STAGG

WARDEN BURL CAIN                      MAGISTRATE JUDGE HORNSBY


## REPORT AND RECOMMENDATION

**Introduction**

Raymond Wade ("Petitioner") was indicted for the first-degree murder of Carlos "Jug" Wheeler on the theory that Petitioner killed Wheeler during the perpetration or attempted perpetration of a robbery.  A Caddo Parish jury convicted Petitioner of a lesser charge of second degree murder, which resulted in a mandatory life sentence.  The conviction was affirmed on appeal.  State v. Wade, 758 So.2d 987 (La. App. 2d Cir. 2000), writ denied, 797 So.2d 864 (La. 2001).  Petitioner then sought post-conviction relief, which the state courts denied.  He next filed this federal petition for habeas corpus that asserts several issues.  It is recommended that the federal petition be denied.

**The Evidence**

Rachel Moran had been Carlos Wheeler's girlfriend for more than three years, and they lived together at 3426 Clark Street.  On the evening Carlos was killed, Rachel attended a friend's bachelorette party.  In the meantime, according to Carlos's friend, Ken Brossette, Carlos and some friends sat around and drank beer at the Clark Street house.  At some point

in the evening, Carlos and Ken delivered Carlos's car to Rachel at the party, and the two men left in another car.  They got back to the Clark Street address around 11:00 p.m.  Carlos realized he had left his house key with Rachel, so the two men stayed outside.  Carlos watered the grass and drank beer.

Ken Brossette received a page from his girlfriend and said he needed to leave.  Carlos borrowed Ken's cell phone and called Rachel to ask that she bring him the house key.  Ken left and went to his house, several blocks away.

Rachel testified that she and her cousin drove up to the house to bring Carlos the key. The cousin noticed the water hose running and a full beer sitting outside, which the women thought was odd.  Rachel nonetheless proceeded to park the car in the driveway.  When she turned down the music in the car, she heard gunshots, so she quickly drove to Carlos's mother's house a few blocks away.  She called the Clark Street house and paged Carlos, but she got no response.  Rachel then called Ken Brossette and a neighbor, Raymond Maxey, and asked that they check on Carlos.

Carlos was found lying face down near the back door of the house, half in and half out, with an SKS rifle underneath him.  At about the same time these events were happening, a resident at the nearby 3416 Clark Street address called the police to report a prowler. Officers Pierce and Cromer responded to the home.  The officers were told that the resident, Paul Williams, called and said someone was trying to get into one of his windows.  The officers, as they were responding, received a second call that a person giving the name of

Carlos was then trying to get into the back door.  The two officers, in separate cars, drove into the area with no lights and as quiet as they could be.  They approached the house at 3416 Clark and noticed a white plastic chair at the front door that was covered in blood.  More blood was found in the backyard and on a back window of the house.  As Officer Pierce was checking the area, he saw two males (Brossette and Maxey) in the backyard of a home about four doors down (3426 Clark), and one of the men began to shout.  Pierce and Cromer went to the scene, and the two men directed them to Carlos' body.

The two officers, plus Officer Washington who had just arrived, checked for a pulse but did not find one.  They entered the house and found it to be in disarray, with some bullet holes in the walls and signs that the back door had been forced open.  The front door was locked from the inside.  The officers noted that the cord from an iron had been used to tie Carlos' feet, but it looked as if he had perhaps broken loose.  An ammunition casing, which Officer Cromer said looked as if it came from the SKS rifle, was found in the kitchen.

Officer Russell Ross arrived at the scene.  Officer Pierce told him that there may be another person in the area who had been shot, and he asked that Ross canvass the area for any other victims or suspects.  Ross went to the neighboring 3416 address where the prowler call had initiated.  He also saw the blood in the white chair in the front of the house, and he saw blood on the side and at the back of the house.  He went behind 3416 Clark and noticed a hole in the backyard fence that allowed access to a concrete drainage ditch that ran behind the homes.  He knew that criminals often use such ditches to avoid detection, so he climbed

through the hole and got in the ditch and started proceeding toward the victim's home. Along the way, Ross saw a spot of blood, then a Georgetown ball cap with blood on it, and a Colt .380 semi-automatic pistol with blood on it.  The blood trail ended a few feet past the pistol, but Ross noticed a lot of blood on the side of the concrete ditch.  He pulled himself up near that area and saw blood on the brush and fence in that area, which suggested to him that this was the place where the bleeding person had entered.  Ross noted that the pistol had a misfed round in it, which would occur after the gun had been fired at least once.

Rachel Moran testified that, on the evening Carlos was killed, he was wearing three gold nugget rings, a gold necklace, matching gold bracelet, and a watch. When Moran was allowed in the house, she noticed that it was very messed up and not as she had left it.  A jewelry box was emptied, and approximately $1,000 to $1,200 in cash was missing from a jacket pocket where she had hidden the cash in a closet.  Moran admitted a prior conviction for possession of crack cocaine.  The facts recited to this point are reflected in the testimony of Pierce, Ross, Maxey, Cromer, Moran and Brossette, found at Tr. 1131-1200.

Officer Danny Duddy conducted a crime scene investigation.  He found four bullet holes in the rear of the house, and three .45 caliber projectiles were found.  One round was in the rear door frame, another was in a bed frame in the bedroom, and the third was on the kitchen floor. The third projectile had blood on it.  Duddy also recovered, about six or seven feet outside the back door, two .45 caliber casings and one .380 caliber casing from fired cartridges. The projectile that caused the fourth hole in the house was not recovered.  Tr.

1201-36.  Duddy took samples of the blood noted above, as well as stains he found in the front yard and on a car parked in front of the house.  Duddy did not find any jewelry on the victim, and he noted that the victim's pockets were pulled out.  On cross-examination, Duddy said that he saw a small amount of marijuana in plain sight on a platter in the living room.

Richard Beighley, a criminalist with a local crime lab, testified as a firearms expert. He stated that his testing showed that the 7.62 x 39 cartridge case found in the house was fired by the Norinco SKS rifle found beneath the victim.  He also determined that the .380 casing found in the yard had been fired by the Colt .380 pistol that was recovered from the concrete ditch.  Tr. 1237-46.

Connie Brown testified as a DNA testing and analysis expert.  She examined blood samples taken from the crime scene and compared them to DNA from Petitioner and the victim.  She testified that it was Petitioner's blood on the .380 Colt pistol, the bloody ball cap, the blood found in the white plastic chair, and the blood found on the stump in the front of the victim's house.  She testified that it was the Carlos' blood on the .45 caliber projectile that was found in the house.  Tr. 1246-57.

Detective Chuck Andrews testified that he followed the blood trails in the area and found that they ended at the 3416 Clark Street address.  He asked that area hospitals be advised that police were looking for a gunshot victim, and a report of such a victim came in soon afterward.  Andrews went to the hospital and spoke to the man, who said his name was Steven Leary.  The man claimed that a group of men in a truck had shot at him while he was

riding his bicycle.  The wound was high in the thigh area close to the hip, but there were no bullet holes in the clothes the man wore when he came to the hospital, and Andrews was doubtful of the story.  Fingerprints were taken, and it was determined that the man who called himself Leary was actually Raymond Wade, Petitioner.

Detective Carolyn Eaves went to the hospital and arrested Petitioner based on outstanding warrants. Petitioner told Detective Eaves that he had given a false name because he knew that there were warrants for his arrest.

Detective Eaves took a statement from Petitioner on June 16, 1997, after Petitioner was released from the hospital.  Petitioner told Detective Eaves that on the day of the shooting he had been on Hollywood Avenue looking for something to smoke when he ran into "Little Mel," a person with whom he had experienced problems.  Later that day, Petitioner said, a small black truck drove by him, and someone in the truck said something to him.  The truck then made a u-turn and, as it passed him, someone in the truck fired shots at him.  One of the shots allegedly caused the injury to Petitioner's leg.  Petitioner gave an explanation for his missing pants, but when officers returned to the area the next day, they found no evidence to back that story.  When Petitioner was told that he was a suspect in a homicide on Clark Street, he claimed that he did not even know where Clark Street was. Tr. 1279-86.

Detective Andrews interviewed Petitioner a few days later, on June 24, 1997. Petitioner told Andrews that he was a thief, not a killer, and had been in the Clark Street area

in an attempt to steal a Cadillac with nice rims on it.  During his effort, Petitioner said, he

heard several men arguing, gunshots rang out, and he realized he had been shot.  Andrews

confronted Petitioner with the fact that a trail of blood (later determined to be Petitioner's)

went behind the victim's residence, through a drainage ditch and several backyards, and back

out to the street.  Petitioner responded that he never went in any backyards and was out in the

street during the entire time.

Detective Andrews then told Petitioner that the .380 pistol had been recovered from

the drainage ditch, covered with blood.  Petitioner denied that he ever had a gun or was

involved in any robbery.  Detective Andrews said on cross-examination that, to his

knowledge, none of the missing jewelry was found either at Petitioner's home or in local

pawn shops.  Tr. 1257-78.

Coroner George McCormick, M.D. testified as a expert in forensic pathology.  He

testified that the victim had been shot once in the chest, with a bullet entering the left side

beneath where the left arm would be if it was down by his side, and traveling left to right

through both sides of the chest until it exited the right chest.  The bullet traveled through both

lungs and the aorta, and the victim died from internal hemorrhage.  Dr. McCormick opined

that the victim would have had to have his arms up in order for the bullet to travel as it did

without striking either arm.  Holding a rifle would be consistent with that theory.  As for the

cord around the victim's legs, Dr. McCormick said that it was loose enough that the victim

could have shuffled with it as it was.  The prosecutor did not ask Dr. McCormick to opine

as to the caliber of the weapon that caused the wound, but Dr. McCormick admitted on cross-examination that the wound was "consistent with" a .45 caliber projectile (such as the round found on the floor of the kitchen with Carlos' blood on it).

Dr. McCormick examined Petitioner's medical records.  He noted that a bullet entered Petitioner's left leg, traveled through, and then entered the right leg.  He stated that the wound would be "consistent" with Petitioner being in a firing position with his left foot placed in front of his planted and dominant right foot.  Tr. 1292-1307.

Defense counsel went on the record and stated, outside the presence of the jury, many reasons for his strong advice that Petitioner not testify in the capital trial.  The reasons included Petitioner's prior convictions that would be admitted to impeach him and a story that counsel thought would not be believed by a jury. Counsel warned that it could be a fatal mistake, but Petitioner, after consulting his family, was adamant that he would take the stand, and he did.

Petitioner admitted that he had prior convictions, based on guilty pleas, for possession of cocaine, simple burglary, attempted simple burglary, second degree battery, and aggravated battery.  Petitioner testified that Carlos contacted him because he wanted to buy one pound of marijuana that he was going to resell to "two dudes from the country" for $1,100.  Petitioner's fee was $750.  Petitioner said that a friend dropped him off at Carlos' house where Carlos was outside watering the yard and said he was locked out.  Petitioner hid the marijuana near a fence because some policemen were nearby.  He later saw two men

behind the house but thought little of it until, a few minutes later, the two men rushed Petitioner and Carlos and held them at gunpoint.  The men took Petitioner and Carlos to the rear of the house, searched Carlos's pockets for keys, and eventually made Carlos break down the door.  The men were looking for the marijuana, and Petitioner told them where he had stashed it.  One of the men retrieved the marijuana, and the two men began to tie up Petitioner and Carlos.  (Petitioner testified that the men tied him in the kitchen with a telephone cord. The police officers who assessed the crime scene found the iron cord around Carlos' legs, but they did not report recovering a telephone cord.) A car pulled into the driveway and blew the horn, which startled the two men, and they began to leave.

Petitioner testified that, at this point, he was on the kitchen floor armed with his .380 pistol that he kept concealed in his pants.  He saw Carlos coming out of a back room. Petitioner and Carlos moved near the back door, where Petitioner saw one of the men jump over the back fence.  The other man was armed with a semi-automatic pistol.  Petitioner testified that when he rushed to the door, that second man turned around and, at that time, Carlos "cocked his firearm (the SKS), and something hit the floor."  Petitioner testified that the man outside turned around and got off about two shots before he ran for the fence. Petitioner said that it was then that he pointed his .380 pistol out of the back door and fired one time before the gun jammed.  Carlos was behind Petitioner at this time, and Carlos fired a shot.  That shot hit Petitioner.  The man with the semi-automatic pistol then came up again and commenced shooting for a second time.  Petitioner first ran inside the house, then hopped

next door and elsewhere trying to find a place to hide.  He then jumped the fence and fell in the canal or ditch behind the house.  It was then that he dropped his Colt .380 pistol.

Petitioner later approached a house, knocked on the door, and asked the man inside to call for help.  The man said that he was going to call the police, but Petitioner asked him not to because Petitioner knew that there were warrants for him on charges of parole violation and battery on a police officer (which Petitioner said arose from an attempt to arrest him for stealing rims).  Petitioner asked the man to call Petitioner's mother, and he sat in the white chair in front of the house.  The man said he was going to call the police, and then Petitioner saw a friend driving by.  Petitioner flagged down the friend, who took him to his mother's house.  Petitioner realized how badly he was injured after he got inside and undressed. He decided to go to the hospital but use his cousin's name to avoid arrest on the outstanding warrants.  Petitioner testified that he changed clothes and was taken to the hospital.

Petitioner admitted that he lied at the hospital and later lied to both detectives who interviewed him. Petitioner testified that he did not know Carlos had even been shot until Detective Eaves came to the hospital to take his fingerprints and asked him about a homicide. Petitioner admitted that, even after police knew his real identity and had arrested him on the warrants, he continued to claim that he had not been on Clark Street and that the blood at the scene was not his.  Petitioner also admitted that he had given a statement to Dr. Paul Ware, a psychiatrist, and told Dr. Ware a version of the story in which the Petitioner went to

Carlos's to buy (rather than sell) marijuana, but he encountered two other potential buyers who pulled guns during the transaction and brought about the shootings. Tr. 1312-65.

**Sufficiency of the Evidence**

The jury was instructed regarding the elements of first degree murder, second degree murder, and manslaughter.  Tr. 1386.  They returned a verdict of guilty of second degree murder.  Tr. 1396-97.  The second degree murder charge instructed the jury that the crime was the killing of a human being under one of two paragraphs:  First, when the offender has a specific intent to kill or to inflict great bodily harm; second, when the offender is engaged in the perpetration or attempted perpetration of one of certain felonies, including aggravated burglary, armed robbery, first degree robbery or simple robbery, even though the offender has no intent to kill or inflict great bodily harm.  Tr. 1389.  <u>See</u> La.R.S. 14:30.1.  The court also set forth the elements of those felonies. Tr. 1387-88.

Petitioner argues that the evidence was not sufficient to support his conviction. In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 99 S.Ct. 2781, 2789 (1979).  The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts."  <u>Id</u>. The <u>Jackson</u> inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether

it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The Louisiana appellate court invoked, recited and applied the Jackson standard on Petitioner's direct appeal, so its decision was not "contrary to clearly established Federal law," and Petitioner can obtain habeas relief only if the State court's decision was an "unreasonable application" of Jackson. 28 U.S.C. § 2254(d); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000); Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

The state appellate court analyzed the sufficiency of the evidence with reference to La.R.S. 15:438, which applies in cases based on circumstantial evidence.  The statute requires the fact finder and reviewer on appeal to accept as proven all that the evidence tends

to prove and, then, convict only if every reasonable hypothesis of innocence is excluded. Petitioner invokes that rule in his federal habeas argument, but a federal habeas court does not apply the Louisiana circumstantial evidence standard. Only <u>Jackson</u> need be satisfied, even if state law would impose a more demanding standard of proof. <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992).

Petitioner concedes that it was proved that Carlos Wheeler was killed by someone and that Petitioner was in the vicinity near the time of the killing. Petitioner urges that the prosecution failed, however, to prove that Petitioner had the specific intent to kill or that he was involved in the perpetration of a robbery at the time of the killing.

The state appellate court concluded that the prosecution's evidence showed that a robbery occurred at Mr. Wheeler's residence. Evidence of the robbery includes Wheeler's pockets were turned out, his jewelry was missing, and the jewelry and cash inside the house were missing. There was also the evidence that the back door was broken in and the fact that Wheeler was shot and killed. The state appellate court noted the following facts and evidence that it believed could convince a rational juror to find that Petitioner was a principal to a robbery that resulted in the killing of Carlos Wheeler:

(1) Petitioner admitted, and the blood DNA evidence established, that Petitioner was at the scene of the crime.

(2) Petitioner, at the scene of the killing, fired a shot from a .380 pistol.

(3)  Petitioner fled from the scene despite a clear need for medical attention and falsified his name at the hospital in an attempt to conceal his identity, which may be indicative of guilt.  Petitioner attempted to explain those actions, but a rational juror could nonetheless discredit the explanation and weigh those factors against him.

(4) The fired .380 casing was found in the yard rather than inside the house, where Petitioner said he was when he fired the pistol out the back door of the house.  The state court acknowledged that the casing might have bounced or been ejected into the yard, but there was no expert evidence in that regard, and a rational juror could determine that this evidence indicated that Petitioner was standing with and shooting in concert with the person who fired the .45 caliber weapon that killed the victim rather than firing from inside the house with the victim.  The location of the casings could also indicate that Petitioner fired both guns and later discarded the .380 pistol that jammed.

(5) Petitioner gave a series of statements, which he admitted at trial were false, that were adjusted to fit the facts as they were given to him by his interviewers.

(6) Petitioner testified that he and Carlos hung out for 25 minutes or so before they were approached by the robbers.  Ken Brossette testified that he left Carlos watering the yard and received a concerned phone call from Carlos's girlfriend no more than 10 minutes after he left the house.

In summary, Petitioner was at the scene of what the evidence showed was a robbery or burglary of some fashion.  The victim was bound and shot.  The victim somehow shot

Petitioner during the event, and Petitioner fled the scene, attempted to conceal his identity, and denied being present at the scene until confronted with DNA evidence to the contrary. Petitioner's several pre-trial statements were all demonstrated and admitted to be false, and his trial testimony did not fit with the time-line set by other witnesses. On the other hand, neither the .45 caliber murder weapon nor any property taken from Carlos' home have ever been recovered or linked to Petitioner.

Reasonable minds could perhaps differ as to whether this evidence is sufficient, under the Jackson standard, to establish Petitioner's guilt of second degree murder based on the killing of a person (1) with specific intent to kill or inflict great bodily harm or (2) with or without specific intent to kill or inflict great bodily harm if the killing was committed during the course of a robbery. Petitioner could be found guilty under the second prong even if the jury believed another person pulled the trigger on the murder weapon so long as it believed Petitioner was a principal to the robbery. See State v. Gurganus, 864 So.2d 771, 775 (La. App. 5th Cir. 2003); State v. Hill, 742 So.2d 690, 696 (La. App. 5th Cir. 1999).

That reasonable minds might differ, or even if a federal judge might believe the state court was incorrect in its application of federal constitutional law, would not permit federal habeas relief. That relief is available only if the state court decision was so wrong as to be an objectively unreasonable application of the Jackson principles. This was a close case in the state court, but that court has spoken and reached a reasoned decision that is within the

realm of reasonableness that insulates it from federal habeas review.  No relief is permitted on this claim.

**Batson Claim**s

Petitioner, who is black, was tried by a jury of 10 whites and two blacks.  During jury selection, the prosecution used four of five peremptory challenges to exclude black prospective jurors. (The defense used 10 of 11 strikes on white prospective jurors.) Petitioner asserts that he is entitled to relief under Batson v. Kentucky, 106 S.Ct. 1712 (1986).

Batson provides a three-step framework for evaluating claims of racial discrimination in jury selection.  First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges on the basis of race.  Second, if the requisite showing is made, the burden shifts to the state to produce a race-neutral explanation for striking the venireperson at issue and thus rebut the defendant's prima facie case.  Third, the trial court must determine whether the defendant has carried his ultimate burden of proving a purposeful discrimination.  That decision is a "pure issue of fact" that is accorded great deference and will not be overturned unless clearly erroneous.  Murphy v. Dretke, 416 F.3d 427, 432 (5th Cir. 2005).

During voir dire, defense counsel made a Batson objection after the state used three of four peremptory challenges against black jurors (Mr. Martin, Mr. Bell and Ms. Bell).  The trial judge responded that he had paid extremely close attention to the selection process and was sensitive to any Batson issue.  He then stated that he believed there was no prima facie

showing, but he added that he would later ask the prosecutor to articulate reasons for the challenges so that the record would be complete.  Tr. 2071-73.  Voir dire continued, and the prosecution used a peremptory strike to remove another black juror, Mr. Dukes.  The defense made another <u>Batson</u> objection and observed that the prosecution had at that point used all but one of its five challenges on prospective black jurors.  The result was that there were no black males on the jury, but there were two black females.  The trial judge again found that the first-step prima facie showing requirement of <u>Batson</u> had not been met.  He again added that he would require the state to give neutral reasons later in the proceeding.  Tr. 2230-31.

The <u>Batson</u> issue was revisited about a week after trial at a hearing on post-verdict motions.  The judge allowed the prosecution to attempt to state race-neutral reasons.  The prosecutor stated that Mr. Martin had "indicated by his mannerisms and responses" that he was unwilling to impose the death penalty and seemed clearly to prefer a sentence of life in prison.  The prosecutor stated that Mr. Bell had completed only his name and address on the juror questionnaire, and he was the only potential juror to do so.  Bell also sat with his arms crossed and "eyed [the prosecutor] somewhat suspiciously" throughout the selection process. Bell was also reported to have taken a "long time" with all of his answers and seemed "somewhat evasive."  Furthermore, after Mr. Bell was death qualified and had the death penalty process totally explained to him, he said that he did not realize the jury determined the sentence.  This caused the prosecutor to wonder how much attention Mr. Bell had paid to the proceedings.

Ms. Bell, the prosecutor stated, had a ninth-grade education that caused him concern because the case involved both circumstantial and DNA evidence, which he thought she might have difficulty fully understanding.  He added that Ms. Bell repeatedly indicated that she could consider the death penalty but would "lean towards" a life sentence.  She also "rolled her eyes" on more than one occasion and seemed inclined to vote for a life sentence in the case of a robbery/homicide.  Ms. Bell also gave some strange answers.  The jurors were asked if there was any reason they could not serve on the jury.  After everyone else had answered, Ms. Bell's response was, "What was the question?"  The prosecutor took this as an indication that Ms. Bell had not been paying full attention.

The prosecutor stated that Mr. Dukes had been excused after he suggested that a robber might be entitled to a self-defense verdict if he killed a robbery victim who attempted to arm and defend himself.  Mr. Dukes also suggested that a life sentence would be appropriate in a case where the victim fought back.  The prosecutor saw that if he struck Mr. Dukes (the defense had used all of its peremptory challenges at that point), Ms. Losey would likely be on the jury, and he thought she was much more likely to impose the death penalty. Tr. 1400-05.

The defense did not respond to the prosecutor's articulation of race-neutral reasons. The court, immediately thereafter, repeated its determination that there was not a prima facie showing but proceeded to determine, for the sake of the record, that he believed the reasons given by the state were race neutral.  He added that he equally understood the reasons given

by the defense for why it used 10 of 11 strikes to remove prospective white jurors.  The motion for new trial based on the <u>Batson</u> issue was denied.  Tr. 1405-08.

The state appellate court reviewed the <u>Batson</u> issue on direct appeal and determined that each of the explanations offered by the prosecutor were race-neutral.  The court ended its analysis at that point and, like the trial court, never proceeded to the third step and asked whether the defendant has carried his ultimate burden of proving purposeful discrimination.

The trial court based its ruling on the absence of a prima facie case, so that will be this court's first area of focus. The party who raises a <u>Batson</u> objection must, to make out a prima facie case, point to circumstances surrounding the peremptory challenges that raise an inference of purposeful discrimination. The trial court should consider all relevant circumstances.  The factors include a pattern of strikes against jurors of a certain race, but they also include the prosecutor's statements and questions during voir dire.  Mere numbers do not establish a prima facie case, and a trial court's determination of the issue is accorded a presumption of correctness which can only be rebutted by clear and convincing evidence. <u>Brown v. Kinney Shoe Corp.</u>, 237 F.3d 556, 561 (5th Cir. 2001).  On habeas review, the federal court must also afford the deference required by 28 U.S.C. § 2254(d).

Petitioner's objection at trial was supported solely by pointing out that four of five strikes were used against black prospective jurors.  Defense counsel did not point to any questions or statements by the prosecutor, or any other facts, in support of the argument for a prima facie case.  Petitioner's brief on direct appeal also relied solely on the numbers to

urge a prima facie case.  Tr. 2264-65.  Finally, Petitioner merely repeats that "four of five"

argument in his federal petition.

Petitioner has pointed to nothing more than numbers, but a "prima facie case of racial

discrimination requires a defendant to 'come forward with facts, not just numbers alone.' "

U.S. v. Branch, 989 F.2d 752, 755 (5th Cir. 1993).  "[A] defendant who requests a prima

facie finding of purposeful discrimination is obligated to develop a record, beyond numbers,

in support of the asserted violation." Brown, 237 F.3d at 562, quoting U.S. v. Dawn, 897

F.2d 1444, 1448-89 (8th Cir. 1990). Petitioner has offered nothing beyond numbers, so this

court cannot say that the state court's application of Batson to this case was not only incorrect

but was so wrong as to be objectively unreasonable.  Furthermore, Petitioner never offered

any argument to the effect that the prosecution's race-neutral explanations were pretextual,

and the lack of such an argument or offering might also bar this claim even if a prima facie

case had been established.  See Moody v. Quarterman, 476 F.3d 260, 270-71 (5th Cir. 2007).

No relief is permitted with respect to this claim.

**Victim's Drug Activity**

Rachel Moran, the victim's girlfriend, testified that she had hidden more than $1,000

in cash in a jacket in the closet.  She testified that the victim had given her the money.

Defense counsel asked how the victim had come by the money, but the prosecutor's objection

to the question was sustained.  Tr. 1176.  After Moran concluded her testimony, the trial

court allowed the defense to make a proffer outside the presence of the jury.  Ms. Moran was

again asked the source of the money.  She replied: "I don't know where he got the money from. He sold – he didn't have a job.  He sold marijuana."  The trial judge explained that he had excluded the evidence on the grounds that it was (1) an attack on the victim's character and (2) based on mere speculation by the witness about the source of the funds.  Tr. 1181-85.

The defense argued on appeal that the evidence should have been admitted because the defense was not attacking the character of the victim; rather, the defense wanted to show the likelihood that a drug transaction was taking place at the time of the shooting. A majority of the state appellate panel found that, under state evidence rules, the evidence was relevant and admissible, but it determined that the exclusion of the drug-dealing evidence was harmless in light of the entire record.  That record included testimony of a large amount of cash kept in the house, the victim's wearing of expensive jewelry, and the presence of marijuana in the living room, evidence which implied the victim could be involved to some extent in drug use or sales.  Wade, 758 So.2d at 996.  Judge Williams dissented based on her opinion that the error was not harmless.  She reasoned that the statement that the money came from marijuana sales would support the defense theory, which was in sore need of support because of Petitioner's general lack of credibility.  Id. at 997.[1]

---

[1] Petitioner's argument was posed solely in state-law terms in his original appellate brief (Tr. 2265-66), but after the dissenting judge expressed concern that the exclusion of the evidence violated a Sixth Amendment right to present a defense, the application for rehearing invoked federal law (Tr. 2320), and the application for a writ to the state's high court also invoked federal law.  Tr. 2346.  The state argues that this does not equal proper exhaustion of a federal claim, but the court need not reach the issue if the claim is denied on the merits.

An accused has a due process right to offer the testimony of witnesses and present the accused's version of the facts, as well as the prosecution's, to the jury so that it may decide where the truth lies.  Washington v. Texas, 87 S.Ct. 1920 (1967).  But, to the extent a petitioner challenges the exclusion of evidence based on state law alone, there is no basis for federal habeas corpus relief.  Castillo v. Johnson, 141 F.3d 218, 222 (5th Cir. 1998).  The state court majority did not specifically address the federal claim arising from the exclusion of the evidence, but it did determine that the exclusion of the evidence was harmless.  A federal habeas court must assess the prejudicial impact of constitutional error in a state court criminal trial under the "substantial and injurious effect" standard of Brecht v. Abrahamson, 113 S.Ct. 1710 (1993). See Fry v. Pliler, 127 S.Ct. 2321 (2007).  Under Brecht, a federal court may grant habeas relief on account of constitutional error only if the error had a substantial and injurious effect or influence in determining the jury's verdict.  The petitioner should prevail under this standard when the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error.  Horn v. Quarterman, 508 F.3d 306, 322 n.24 (5th Cir. 2007).

An appellate court may have determined that the exclusion of the evidence was error under the state evidence code articles regarding character and the like, but there has never been a determination that the federal right to present a defense was violated by that exclusion.  The  girlfriend's testimony about the victim's drug dealing would have lent additional support to Petitioner's theory, but, as noted by the appellate court, there was other

evidence that any reasonable juror would have recognized suggested that the victim or members of his household were engaged in at least the use of (if not the sale of) drugs. Under these circumstances, the state court did not render a decision that was an objectively unreasonable application of the principles that require the accused be allowed to present an adequate defense. To the extent one might determine to the contrary, the absence of that additional bit of supporting evidence did not have a substantial and injurious effect on the verdict.  The undersigned has little doubt that the verdict would have been the same had the girlfriend been allowed to utter the one-sentence claim that the victim sold marijuana for a living.  No relief is available on this claim.

**Prior Crimes Evidence**

Petitioner asserts, as he did on direct appeal, that the trial court erroneously admitted evidence of prior or other crimes committed by Petitioner.  He points to a detective's testimony that Petitioner said he lied about his identity because he was afraid of outstanding warrants for his arrest.

Petitioner presented this argument on direct appeal solely in terms of whether it violated state evidentiary law and procedure. Tr. 2266-69. The state appellate court rejected the claim because the evidence, as shown by Petitioner's testimony was actually of some benefit to the defense theory because it attempted to explain Petitioner's flight from the scene and his use of a false name at the hospital.  <u>Wade</u>, 758 So.2d at 996-97.

Petitioner's habeas petition once again presents the issue in terms of state law, and Petitioner has not identified any clearly established Supreme Court precedent that was unreasonably applied so as to permit relief under Section 2254(d).  Federal courts do not grant habeas relief based on mere errors in the application of state evidentiary rules or even consider it relevant whether state evidentiary rules were satisfied. Only federal constitutional errors that satisfy the demanding standards of Section 2254 merit habeas relief. The Due Process Clause provides a mechanism for relief when a State court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003), citing Dawson v. Delaware, 112 S. Ct. 1093 (1992) and Estelle v. McGuire, 112 S.Ct. 475 (1991). If constitutional error is found, a petitioner's claim will still fail absent a showing that the evidence had a substantial and injurious effect or influence in determining the jury's verdict. Bigby, 340 F.3d at 272.  Assuming a federal claim was exhausted, and that appears unlikely, there is no basis in this record to find constitutional error. The reference to outstanding warrants supported the defense theory in part, and Petitioner himself testified at length about the warrants and underlying charges (which were not mentioned by the state during its case-in-chief) when he took the stand. Assuming error, there was no prejudice warranting relief under the demanding standards set forth above.

**Grand Jury Foreman**

Petitioner raised a number of claims in a post-conviction application.  This court previously issued an order to the effect that some of the claims were unexhausted and required Petitioner to dismiss those claims or risk seeing the entire petition being dismissed as a mixed petition.  Petitioner filed a response and, based on the procedural mess that was made in the state court, urged that the claims were exhausted.  Rather than resolve the exhaustion issue and base a decision on it, the undersigned recommends that the better course is to deny the claims on the merits.

The first post-conviction claim is that Caddo Parish's method of selecting grand jury foremen at the time of Petitioner's indictment was racially discriminatory.  See Campbell v. Louisiana, 118 S.Ct. 1419 (1998).  This court has granted habeas relief on such claims (although not arising from Caddo Parish), but this particular claim is procedurally barred.

The trial judge ruled that the claim was barred because it was not raised in the trial court during the proceedings leading up to conviction and, in the alternative, the claim lacked merit.  Tr. 2423-27.  No other Louisiana court directly addressed the claim. A procedural bar serves as a defense to a habeas petition when the state court clearly and expressly relied upon the bar in its last reasoned ruling.  Coleman v. Thompson, 111 S.Ct. 2546-2557 (1991); Foster v. Johnson, 293 F.3d 766, 786 (5th Cir. 2002).  This is equally true when the state court invokes a procedural bar and, in the alternative, addresses the merits of the federal

claim.  Harris v. Reed, 109 S.Ct. 1038, 1044 n.10 (1989); Cotton v. Cockrell, 343 F.3d 746, 754 (5th Cir. 2003).

The Fifth Circuit has recognized that the failure of a Louisiana defendant to challenge the legality of the grand jury venire by pre-trial motion to quash is a procedural bar if that failure is relied upon by the state courts.  Williams v. Cain, 125 F.3d 269, 274-275 (5th Cir. 1997).  See also Francis v. Henderson, 96 S.Ct. 1708 (1976) (Louisiana prisoner's habeas petition was barred for failure to raise the grand jury discrimination claim before trial as required by state law).

The procedural bar, which the state has directly asserted, may be overcome only upon a showing of cause and prejudice.  Petitioner argues that he meets those requirements because his attorney rendered ineffective assistance when he did not file a timely motion to quash the indictment based on the foreman issue.  The Fifth Circuit has affirmed a decision that an attorney's failure to file a motion to quash with respect to a foreman-discrimination claim does not result in prejudice if a properly constituted grand jury would have simply re-indicted the defendant on the same charge.  Pickney v. Cain, 337 F.3d 542 (5th Cir. 2003). As in Pickney, there was more than adequate evidence in this case by which the state could have obtained another indictment by a properly selected grand jury had counsel filed and won a motion to quash.  Accordingly, Petitioner cannot show the prejudice necessary to overcome the procedural bar defense to his attack on the indictment.  The related Strickland claim also fails to warrant relief due to the inability to show prejudice.

**Ineffective Assistance of Counsel**

The bulk of Petitioner's ineffective assistance claim is directed at the failure of counsel to file a motion to quash the indictment, an issue that was rejected above.  Petitioner next urges that counsel was ineffective because he failed to obtain an expert in violent crime investigations that could have supported the defense theory and because further investigation "may have revealed a witness" who could describe a car that witness Raymond Maxey saw[2] drive from the scene at a high rate of speed.  The trial court rejected the "failure to investigate" claim because Petitioner pointed to no favorable information that allegedly would have been revealed by further investigation.  Rather, Petitioner merely speculated that there "may be" more information that an investigation might yield.  Tr. 2427.

Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel.  Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).  Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different.  A reasonable probability is one sufficient to undermine confidence in the outcome.  Id. 104 S.Ct. at 2068.

---

[2] Maxey actually testified that he was getting ready for bed when he heard gunshots and then "heard a car" drive off in a hurry. Tr. 1161. He did not say that he saw the car.

The test for habeas purposes is not whether a petitioner made the showing required under Strickland. The test is whether the state court's decision – that the petitioner did not make the Strickland showing – was contrary to, or an unreasonable application of, the standards provided by Strickland's clearly established federal law. Williams v. Taylor, 120 S.Ct. 1495 (2000); Henderson v. Quarterman, 460 F.3d 654, 665 (5th Cir. 2006).

Petitioner offers this court nothing more than the bold conclusions made in the state court.  There are no facts to suggest that counsel did not engage in adequate investigation, and there is absolutely no basis to determine that the absence of additional investigation results in a reasonable probability that the verdict would have been different. The contention that counsel should have hired an expert in violent crime investigations relies on pure speculation that the expert might have found something to support the defense. The state court's decision was not an objectively unreasonable application of Strickland to the arguments presented it.  Federal habeas relief is not available.

**Jury Instruction on Principals**

Petitioner argues that the trial court violated his due process rights when it instructed the jury erroneously on the law of principals.  Petitioner adds that his counsel was ineffective because he did not object to the jury instructions. Petitioner argues that the court's instruction relieved the state of its burden of proving that Petitioner actually possessed the same requisite intent of whoever pulled the trigger on the murder weapon.  This assertion is based on the assumption that the jury convicted based on a finding that Petitioner (armed with a .380

pistol) was a principal to a robbery committed by the person who was armed with the .45 caliber murder weapon.

Petitioner's argument is based on a charge of first degree murder, which requires specific intent to kill or commit great bodily harm.  Petitioner was convicted, however, of second degree murder.  Louisiana law permits a conviction of that crime when one is a principal engaged in the commission of a robbery when an accomplice commits murder, even though the non-shooter lacked specific intent to kill or inflict great bodily harm.  State v. Moore, 2007 WL 914637, *5 (La. App. 1st Cir. 2007), citing State v. Cotton, 341 So.2d 362, 364 (La. 1976) (if a co-perpetrator of a burglary is guilty of second degree murder because he shot and killed the victim, then other perpetrators who are principals to the burglary are likewise guilty of second degree murder).

The state court rejected Petitioner's argument on the grounds that the jury instructions were consistent with Louisiana law. Tr. 2426-27.  Petitioner has not explained how the instructions were erroneous in light of his second degree murder conviction.  The inclusion of the principal instruction was relevant to the felony-murder theory of the prosecution, so counsel was not ineffective for his lack of objection to the instructions. Nothing in the instructions that were given wrongfully shifted any burden to Petitioner with regard to intent, nor did the instructions wrongfully allow a conviction of a specific-intent-only crime based on the intent of a fellow principal.  No habeas relief is available under these circumstances.

Accordingly;

**IT IS RECOMMENDED** that the Petition for Writ of Habeas Corpus be **denied** and that Petitioner's complaint be dismissed with prejudice.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 15th day of May, 2008.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE